## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

Valerie L. Johnson,                                    Civil No. 10-4373 (DWF/JJG)

                  Plaintiff,

v.                                                     REPORT AND RECOMMENDATION

Michael J. Astrue,

                  Defendant.

_____

JEANNE J. GRAHAM, United States Magistrate Judge

Plaintiff Valerie L. Johnson brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the denial of her application for Social Security disability insurance benefits. The case has been referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B), and the parties have filed cross-motions for summary judgment in compliance with District of Minnesota Local Rule 7.2(b). For the reasons set forth below, the Court recommends that Plaintiff's motion be denied, Defendant Commissioner of Social Security Michael J. Astrue's motion be granted, and the case be dismissed.

## I.        BACKGROUND

Plaintiff protectively filed an application for disability insurance benefits on May 9, 2008, alleging she became disabled on March 19, 2007. After her application was denied initially and on reconsideration, she requested a hearing before an Administrative Law Judge (ALJ). Plaintiff appeared at the hearing and testified. In the subsequent decision, the ALJ determined that Plaintiff was not disabled. Plaintiff requested review by the Appeals Council, which denied her

request. Therefore, the ALJ's decision became the final decision of the Defendant Commissioner.

### A.     Plaintiff's Medical Records

The Court begins its review of the administrative record with Plaintiff's medical records. Plaintiff initiated care with Dr. Hazem M. Sedra on February 20, 2007, reporting acute pain in her shoulders, neck, back, knees, elbows, and wrists. (R. at 305.) She appeared panicked and emotionally distraught, which she attributed to interpersonal and work stressors. (*Id.*) Dr. Sedra restricted Plaintiff from working for a week and prescribed Cymbalta for anxiety and depression. (*Id.* at 306.) One week later, Dr. Sedra described Plaintiff as much calmer, less distraught, and able to concentrate. (*Id.*)

At Dr. Sedra's recommendation, Plaintiff saw physician assistant Roger Thomas on February 22, 2007. (*Id.* at 312.) An x-ray revealed "a very straight reversal of the normal lordotic cervical curve" and "some foraminal narrowing" of two cervical discs. (*Id.*) Based on the x-ray results, Mr. Thomas ordered a magnetic resonance imaging (MRI) of Plaintiff's spine. (*Id.*) The resultant images showed normal soft tissue, bones, joints, vertebrae, disc spaces, and alignment. (*Id.*)

Plaintiff returned to Dr. Sedra on March 2, 2007 for her annual examination. (*Id.* at 298, 307.) Dr. Sedra increased Plaintiff's Effexor dosage and recorded Plaintiff's reports of chronic pain in her shoulders and spine. (*Id.*) A few weeks later, Plaintiff told Dr. Sedra that her depression had improved, that she was content with her treatment, and that she was suffering no side effects. (*Id.* at 299.) Dr. Sedra described Plaintiff's mood as much improved, with increased concentration and focus. (*Id.*)

Plaintiff also followed up with Mr. Thomas in March 2007, reporting improved symptoms overall, but severe headaches that were only somewhat alleviated with Excedrin. (*Id.* at 312.) Mr. Thomas mentioned the recent normal MRI and concluded that the very mild foraminal narrowing did not cause any direct nerve compression. (*Id.*) A physical examination indicated tautness on the right side of Plaintiff's spine, a full range of shoulder motion, less discomfort with rotation, and "excellent" grip strength. (*Id.*) Mr. Thomas referred Plaintiff to physical therapy. (*Id.*) When Plaintiff saw Mr. Thomas a few weeks later, she described her pain as burning and rated it a six or seven out of ten. (*Id.* at 313.) Mr. Thomas found no swelling on palpation or evidence of cranial nerve distribution, however, and the range of motion for Plaintiff's shoulders was complete, although painful. (*Id.*) Mr. Thomas noted that Plaintiff continued to describe neck pain, "despite the fact that her clinical examination and [MRI] examination remains somewhat unremarkable." (*Id.*)

Plaintiff attended several physical therapy sessions in March and April of 2007. (*Id.* at 323-25.) Generally, she did not obtain long-lasting relief from these sessions, and treatment was ceased at her request. (*Id.* at 323.)

On April 2, 2007, Dr. Sedra defined Plaintiff's medical history as mild obstructive lung disease, chronic cigarette smoking, major depression, obesity, hypertension, and arthropathy of both shoulder joints and cervical neck joints. (*Id.* at 297.) Plaintiff reported that Effexor had significantly improved her depression, but that she was experiencing considerable sleepiness from her prescribed medications, which also included Gabapentin and Trazodone. (*Id.*) Dr. Sedra recommended some adjustments in Plaintiff's medication regimen and advised her to see an orthopedist for shoulder pain. (*Id.*)

Plaintiff consulted with Dr. Bangalore Vijayalakshmi on April 4, 2007, on a referral from Mr. Thomas. (R. at 264, 271.) She told Dr. Vijayalakshmi that she had suffered from chronic pain for more than twenty years, and that her pain had significantly increased over the past year. (*Id.* at 264.) She described extreme neck pain radiating into her shoulders and down her spine, intermittent tingling and numbness in her hands, weakness, headaches, aching knee pain, and depression caused by pain. (*Id.* at 265-66.) Lifting, cooking, cleaning, driving, typing, and stress exacerbated the pain, but she obtained relief from ice and pain medication. (*Id.* at 265.) Dr. Vijayalakshmi noted a medical history of fibromyalgia, diagnosed twenty-three years ago; bilateral shoulder surgeries; asthma; bronchitis; and chronic obstructive pulmonary disease (COPD). (*Id.* at 266.) He listed Plaintiff's medications as Gabapentin, Effexor, Trazodone, Tramadol, and ibuprofen. (*Id.*) He also noted that Plaintiff smoked a pack of cigarettes a day. (*Id.* at 267.)

On examination, Dr. Vijayalakshmi found Plaintiff a well-developed, well-nourished woman in no acute distress and in good spirits. (*Id.*) He rated her upper and lower limb strength a five out of five. (*Id.* at 268.) Her reflexes were symmetrical, her gait unremarkable, and her functional activity unimpaired. (*Id.*) However, her shoulders and back were tender to palpation, limited in range of motion, and "tight." (*Id.*) Bending forward and backward and moving her shoulders caused discomfort. (*Id.* at 269.) Dr. Vijayalakshmi observed that the recent x-ray and MRI of Plaintiff's spine and shoulder were normal. (*Id.*) Dr. Vijayalakshmi's impression was that Plaintiff suffered from myofascial pain, dysfunction syndrome of her upper and lower quarters, a history of fibromyalgia, sacroiliac joint dysfunction, and an acute exacerbation of chronic cervicothoracic musculoligamentous sprain or strain. (*Id.*) Reviewing her medications, Dr. Vijayalakshmi recommended a muscle relaxant to help with stiffness and reminded Plaintiff

to take her sleep medication at bedtime instead of in the morning to decrease her sleepiness during the day. (*Id.* at 270.) Dr. Vijayalakshmi asked a physical therapist in the office to perform some craniosacral therapy and myofascial release techniques, after which Plaintiff was "quite ecstatic." (*Id.*) Based on this successful treatment, Dr. Vijayalakshmi referred Plaintiff to a physical therapy program three times a week for four weeks. (*Id.*) Lastly, he restricted Plaintiff from working from April 4, 2007 until May 4, 2007. (*Id.* at 271.)

Plaintiff soon began physical therapy with a new therapist, Rhonda Salentiny. Results were mixed, but Plaintiff improved slightly overall. (*Id.* at 329-58.) Toward the end of the course of treatment, Ms. Salentiny thought it would be beneficial to suspend further therapy until Plaintiff met with an orthopedist and had another MRI of her shoulders. (*Id.* at 348.)

Plaintiff consulted with orthopedist Dr. Colin Fennell on May 23, 2007. (*Id.* at 309.) She rated her shoulder pain a seven on a ten-point scale. (*Id.*) An examination of Plaintiff's head and neck showed a "catch in the movements of her cervical spine with some discomfort in all directions." (*Id.* at 310.) Plaintiff was not willing to fully flex or extend her shoulder or neck, but Dr. Fennell did not see any evidence of radicular pain in these areas. (*Id.*) Range of motion in Plaintiff's shoulders was 90% for elevation, 90% for abduction, and 50% for external rotation. (*Id.*) She displayed no weakness in her rotator cuff, and her biceps and deltoids functioned normally. (*Id.*) Non-localized tenderness was present throughout both shoulders, and both hands were somewhat numb. (*Id.* at 310, 311.) Dr. Fennell's diagnosis was chronic shoulder pain and possible bilateral carpal tunnel syndrome. (*Id.*) He recommended diagnostic testing on her wrists and an MRI of her shoulders. (*Id.*)

On May 17, 2007, Plaintiff had a CT scan of her brain and head, and all results were normal. (*Id.* at 319.) Plaintiff's shoulder MRI revealed an intact rotator cuff and normal

musculature, but the examiner could not rule out tendonitis or a partial tear, however. (*Id.* at 317.) Plaintiff revisited Dr. Fennell on June 8, 2007, after he reviewed the CT scan and MRI results. (*Id.* at 365.) Dr. Fennell noted no change between the MRIs taken in 2000 and 2001 and recent MRIs. (*Id.*) He saw nothing on the most recent MRI to explain a decreased range of motion of Plaintiff's shoulders. (*Id.*) Absent any imaging results to validate her complaints, he supposed there could be a neurologic explanation. (*Id.*) Dr. Fennell closed the treatment note by remarking, "Based on the oddities of her evaluations, I am not convinced that we will necessarily find any specific pathology that is treatable." (*Id.*)

In June 2007, Dr. Vijayalakshmi conducted an electrodiagnostic study of Plaintiff's upper limbs to rule out carpal tunnel syndrome. (*Id.* at 285.) He noted normal strength, sensation, and reflexes. (*Id.*) Indeed, all results were normal. (*Id.*) Dr. Vijayalakshmi recommended massage therapy and a home exercise program to manage the pain. (*Id.*) He repeated his recommendation for massage therapy in a letter dated July 3, 2007. (*Id.* at 290.)

Plaintiff followed up with Dr. Fennell on July 2, 2007. (*Id.* at 366.) The doctor noted that recent nerve conduction studies had not shown any evidence of nerve entrapment in Plaintiff's arm. (*Id.*) Dr. Fennell reiterated that there was no evidence of cervical disc pathology or peripheral changes, concluding that Plaintiff would not be a candidate for surgery. (*Id.*) He suggested that Plaintiff resume physical therapy. (*Id.* at 351.) At Plaintiff's final appointment with Dr. Fennell the following month, in August 2007, she rated her right shoulder pain a six out of ten and her left shoulder pain a four or five out of ten. (*Id.* at 361.) Dr. Fennell again noted that Plaintiff had no degenerative changes or nerve entrapment, and he described Plaintiff as "very poor at best in attending therapy" and doing her home exercises. (*Id.* at 367.) He declined

to fill out Plaintiff's Family Medical Leave Act (FMLA) forms and suggested that she contact Dr. Vijayalakshmi, who had previously imposed a one-month work restriction. (*Id.*)

Plaintiff began physical therapy with Kathy Sorensen on July 10, 2007. (*Id.* at 352.) She was not compliant with Ms. Sorensen's home exercise program, however, nor was she receptive to Ms. Sorensen's advice regarding nutrition and smoking cessation, even when Ms. Sorensen explained that these lifestyle choices affected Plaintiff's myofascial pain and overall health. (*Id.* at 356-57.) Plaintiff discontinued physical therapy with Ms. Sorensen shortly thereafter. (*Id.* at 358.)

On July 26, 2007, Plaintiff met with Dr. Brook Redd to discuss the possibility of bariatric surgery. (*Id.* at 295.) At the time, she weighed 244 pounds and was 5 feet, 1 inch tall. (*Id.*) Dr. Redd thought Plaintiff would be a good surgical candidate and encouraged her to stop smoking, exercise, and eat less to prepare herself for the surgery and the post-operative diet. (*Id.*) There is no evidence that Plaintiff followed through with Dr. Redd's suggestions or further pursued this surgical option.

Plaintiff returned to Dr. Vijayalakshmi on August 27, 2007, reporting widespread pain that had not changed since her previous visit. (*Id.* at 272.) Dr. Vijayalakshmi took note of the recent normal x-ray, MRI, and CT scan. (*Id.*) He also documented the results of his recent electrodiagnostic study, which was negative for carpal tunnel syndrome, ulnar neuropathy, cubital tunnel syndrome, peripheral neuropathy, and cervical radiculopathy. (*Id.* at 273.) As with previous appointments, the physical examination was generally unremarkable. Plaintiff's neck was supple with no lymphadenopathy; her extremities were not tender; there were no obvious joint deformities, asymmetries, or other musculoskeletal problems; muscle testing revealed full strength in both upper limbs; her reflexes were symmetrical; there was no numbness or

diminished sensitivity; she could independently transition from lying to sitting to standing; and testing was negative for neuroforaminal compression. (*Id.* at 275-76.) On the other hand, Dr. Vijayalakshmi recorded tightness and tenderness of the spine, neck, and shoulders, and a decreased range of motion in bending and shoulder movement. (*Id.* at 276.) Plaintiff told Dr. Vijayalakshmi that she did not believe she could return to her job due to pain, and he correspondingly noted,

> I do believe currently that the patient is not capable of any gainful employment. She needs to be referred to a chronic pain program wherein they need to have a multidisciplinary approach for her chronic pain. I will refer her to the pain clinic in Fargo for her chronic pain.

(*Id.* at 277.) Dr. Vijayalakshmi agreed to complete Plaintiff's FMLA paperwork, but said that future paperwork would need to be completed by her primary care physician. (*Id.*)

Plaintiff returned to Dr. Vijayalakshmi on February 19, 2008, bringing with her a long-term disability statement for him to complete. (*Id.* at 278.) Plaintiff said she did not have a primary care physician. (*Id.*) Plaintiff told Dr. Vijayalakshmi that her pain and symptoms had worsened significantly; she rated her pain a six or seven on a ten-point scale. (*Id.* at 279.) She also reported tingling and numbness in her hands. (*Id.*) Plaintiff said she spent most days in her recliner and needed help with chores like vacuuming and washing dishes. (*Id.*) As with prior visits, Dr. Vijayalakshmi's examination revealed some tenderness, tightness, and discomfort, but no significant symptoms were documented. (*Id.* at 280-82.) Nonetheless, Dr. Vijayalakshmi completed the long-term disability form and wrote that Plaintiff was not capable of gainful employment at that time. (*Id.* at 283.) He reiterated to Plaintiff that she needed to follow a multidisciplinary approach to her pain at a pain clinic. (*Id.*) Plaintiff assured Dr. Vijayalakshmi that she would enroll in a pain clinic once her husband obtained insurance. (*Id.*)

Plaintiff sought help with tobacco cessation on February 27, 2008. (*Id.* at 386.) She was motivated by her asthma, COPD, and trouble breathing. (*Id.*) Her preliminary plan was to gradually reduce the number of cigarettes she smoked each day until she could fully commit to becoming a non-smoker. (*Id.* at 387.) Plaintiff also had a general medical appointment the same day, at which her chief complaints were shoulder pain, neck pain, and chronic headaches. (*Id.* at 388.) Dr. David Vogt administered a Depomedrol injection and recommended physical therapy. (*Id.* at 388-89.) Plaintiff rebuffed the recommendation and, according to Dr. Vogt, "seem[ed] more interested in having [a] disability form completed." (*Id.* at 389.)

Plaintiff began treatment with chiropractor Thomas Mickelson, D.C., in July 2008, describing neck pain, headaches, upper back soreness, and aching shoulders. (*Id.* at 495.) In January 2009, she presented with a sore neck, jaw pain, headaches, and neck soreness. (*Id.*) After treating Plaintiff three times, Dr. Mickelson offered the opinion that Plaintiff's chronic neck and back pain would preclude her from seeking any meaningful employment. (*Id.* at 494.)

On January 13, 2009, Plaintiff asked Dr. Vogt to complete a social security disability evaluation form. (*Id.* at 507.) She reported low back pain, neck pain, stiffness in her neck, and a complete inability to use her right arm other than minimal grasping with her hand. (*Id.*) On examination, Plaintiff exhibited stiffness and mild tenderness in her neck, spasms in her upper back, and pain with palpation in her lumbar spine. (*Id.* at 508.) Dr. Vogt prescribed acetaminophen, ibuprofen, and a muscle relaxant for pain management. (*Id.* at 508, 509.) Plaintiff declined x-rays of her hands, clavicle, shoulder, and spine. (*Id.* at 511.) Although Dr. Vogt did not record any examination or testing of Plaintiff's right arm or hand, he nonetheless remarked that she was very limited in the use of her right arm. (*Id.*) Plaintiff presented Dr. Vogt with disability paperwork again on May 27, 2009. (*Id.* at 498.) There is no report of arm pain or

dysfunction or any objective findings concerning Plaintiff's arm. (*Id.*) Nevertheless, Dr. Vogt opined that Plaintiff was not able to use her right arm and would be limited to sedentary work. (*Id.*)

Plaintiff commenced care with Dr. Maile Roper on July 14, 2009, reporting low back pain, right arm numbness, and neck and shoulder pain. (*Id.* at 526.) Dr. Roper described Plaintiff's illnesses as obesity, gastroesophageal reflux disease, COPD, depression, allergies, and fibromyalgia. (*Id.* at 528.) The physical examination was generally normal, although Plaintiff's cervical and AC joints were tender. (*Id.* at 528-29.) Dr. Roper recommended that Plaintiff see a psychiatrist and work with a physical therapist on general conditioning. (*Id.* at 529.)

In August 2009, Plaintiff presented to Dr. Vogt with low back pain, right leg weakness, neck pain, and numbness in her hands. (*Id.* at 496.) Plaintiff told Dr. Vogt that her right arm was permanently disabled with very limited functioning. (*Id.*) Plaintiff declined x-rays and arthritis testing, however. (*Id.*) Plaintiff also declined Dr. Vogt's recommendations of physical therapy and cortisone injections. (*Id.*) Despite the lack of any diagnostic testing or findings, Dr. Vogt diagnosed Plaintiff with cervical degenerative joint disease. (*Id.*)

Plaintiff returned to Dr. Roper's office on August 3, 2009. (*Id.* at 522.) Plaintiff described pain in her neck, shoulders, hips, low back, and hands, reaching a six on a ten-point scale. (*Id.* at 523.) Ice, medication, and rest reportedly eased the pain, however, and Dr. Roper described Plaintiff's relief as "adequate." (*Id.*) On examination, Plaintiff's extremities were stiff, but she had a normal range of motion. (*Id.* at 525.) Her head, neck, and spine were normal in alignment and mobility. (*Id.*) All neurologic findings were also normal. (*Id.*) Dr. Roper's impressions were probable fibromyalgia, old shoulder injuries, and COPD. (*Id.*) She recommended a vigorous reconditioning program, counseling, education regarding weight loss, and dietary changes. (*Id.*)

Dr. Roper completed a Physical Capacities Evaluation worksheet at Plaintiff's appointment on October 26, 2009. (*Id.* at 530-39.) She opined that Plaintiff could not sit for more than one hour in an eight-hour day; that Plaintiff could not walk or stand for more than one hour in an eight-hour day; that Plaintiff could not grasp, push, pull, manipulate, write, type, or assemble with either hand; that Plaintiff could not use foot controls with either foot; that Plaintiff could occasionally lift or carry up to ten pounds, but never more than ten; and that Plaintiff could never climb, balance, stoop, kneel, crouch, or crawl. (*Id.* at 530-31.) Dr. Roper remarked that Plaintiff's fatigue and pain would prevent her from working fulltime. (*Id.* at 531, 532.) With respect to the mental effects of Plaintiff's pain, Dr. Roper wrote that her pain would moderately affect her attention and concentration. (*Id.* at 533.)

Dr. Roper's findings were based largely on Plaintiff's self-reports. (*Id.* at 534.) The actual physical examination that day revealed only general discomfort, a tense and tender cervical spine, normal gait and station, spasms and trigger points in the head and neck, and normal reflexes and sensation. (*Id.* at 537-38.) Dr. Roper also noted that Plaintiff enjoyed gardening, did not exercise, did not eat a well-balanced diet, and smoked two packs of cigarettes a day. (*Id.* at 536.)

**B.    Findings of the Medical Consultants**

On June 12, 2008, Dr. Owen Nelsen completed a Psychiatric Review Technique Form (PRTF), focusing on Listing 12.04 (affective disorders) and Listing 12.07 (somatoform disorders). (R. at 420-433.) For Listing 12.04, he determined that Plaintiff suffered from a mood disturbance, sleep disturbance, decreased energy, and difficulty concentrating or thinking. (*Id.* at 423.) For Listing 12.07, he determined that Plaintiff manifested physical symptoms for which there were no demonstrable organic findings or known psychological mechanisms. (*Id.* at 426.)

Under the "B" criteria of the listings, Dr. Nelsen found that Plaintiff was moderately limited in activities of daily living; mildly limited in maintaining social functioning; moderately limited in maintaining concentration, persistence, or pace; and had no episodes of decompensation. (*Id.* at 430.) Dr. Nelsen saw no evidence of "C" criteria. (*Id.* at 431.)

Dr. Nelsen further noted that Plaintiff's depression was successfully managed with medication, and that she had no psychiatric hospitalizations or suicide attempts. (*Id.* at 432.) Recent treatment notes confirmed that Plaintiff was satisfied with the treatment of her depression, could concentrate and focus adequately, and was typically described as cooperative and in good spirits. (*Id.*) According to Plaintiff's own reports, she could generally function independently, make meals, do light housework, drive, shop, spend time with family, get along with others, and follow instructions. (*Id.*) Based on the record and his findings, Dr. Nelsen concluded that Plaintiff did not meet either Listing 12.04 or Listing 12.07. (*Id.* at 432.)

In a corresponding Mental Residual Functional Capacity Assessment (MRFCA), Dr. Nelsen found Plaintiff not significantly limited or only moderately limited in all categories. (*Id.* at 434-36.) He concluded that Plaintiff would be able to concentrate on, understand, and remember routine and detailed instructions, but would be moderately limited in following complex and technical instructions. (*Id.* at 436.) Similarly, her ability to work with adequate persistence and pace would be mildly to moderately impaired, but adequate for routine or somewhat detailed tasks. (*Id.*) She would also be mildly to moderately limited in her ability to handle stress, but could cope with routine stressors in a work setting. (*Id.*) Her abilities to interact and get along with coworkers, the public, and supervisors would not be significantly limited. (*Id.*)

Dr. Aaron Mark completed a Physical Residual Functional Capacity Assessment (PRFCA) on June 13, 2008. (*Id.* at 438-45.) He assessed Plaintiff for chronic pain, fibromyalgia, COPD, asthma with smoking, and obesity. (*Id.* at 438.) In summarizing Plaintiff's medical records, Dr. Mark noted in particular that she had refused to continue with physical therapy and was not compliant with home exercise programs. (*Id.*) Dr. Mark also emphasized the normal x-rays, MRIs, CT scan, and nerve studies. (*Id.* at 440.) Based on Plaintiff's records, he opined that Plaintiff could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, stand or walk for six hours in an eight-hour workday, sit for six hours in an eight-hour workday, and push or pull without limitation. (*Id.* at 439.) Although Plaintiff could never climb a ladder, rope, or scaffold, she could occasionally climb stairs, stoop, kneel, crouch, and crawl. (*Id.* at 440.) She would also be limited in reaching overhead, but not in other directions. (*Id.* at 441.)

### C.     Plaintiff's Testimony at the Administrative Hearing

At the administrative hearing on December 14, 2009, Plaintiff testified to the following. She was fifty years old, married, and lived in a house with her spouse, younger daughter, and infant grandson. (R. at 38, 39.) As an enrolled member of the White Earth Nation, she was eligible to receive health coverage and treatment at the White Earth Indian Reservation. (*Id.* at 44.)

Plaintiff testified that she wore a neck brace two or three times a week. (*Id.* at 41.) Numbness in her hands made writing difficult. (*Id.* at 42.) She perceived her most severe physical problems as neck pain, shoulder pain, numbness in her hands, lower back pain, and right leg weakness. (*Id.* at 47.) She described her neck pain as constant, reaching a ten on a ten-point scale. (*Id.* at 48.) Muscle relaxants and ibuprofen diminished the pain to a five, however, and injections and ultrasound treatment also helped. (*Id.* at 49-50.) Plaintiff described her

shoulder pain as throbbing, burning, and ranging from a five to an eight on a ten-point scale. (*Id.* at 51.) The pain in her lower back and hips fluctuated between a five and a ten. (*Id.* at 53.) She experienced headaches two to three times a week and received only temporary relief from medication. (*Id.* at 71.) Her most recent complaint was leg weakness and rigid hips. (*Id.* at 57.)

In addition to ibuprofen and muscle relaxants, Plaintiff also took Advair, Singulair, Effexor, and Trazodone. (*Id.* at 55, 59.) She used a nebulizer for her asthma and COPD, and she decreased her smoking to a half a pack of cigarettes a day. (*Id.* at 55.)

Plaintiff typically went to bed between 1:30 and 4:00 a.m. and awoke between 11:00 a.m. and 2:00 p.m. (*Id.* at 63.) When awake, she lay on the couch with an icepack for most of the day. (*Id.* at 64.) She was able to take care of most of her personal needs, however, and she sometimes cooked, vacuumed, washed dishes, did laundry, shopped, cared for her dog, drove, and gardened. (*Id.* at 65-66, 74.) Plaintiff felt she could walk a few blocks, stand for ten minutes at a time, sit for thirty minutes at a time, squat, climb stairs, and use her hands to do buttons and zippers. (*Id.* at 68-69.) Every week or two, Plaintiff stayed overnight with her four oldest grandchildren while her daughter worked. (*Id.* at 39.)

Plaintiff last worked in April 2007 as a data entry clerk in the sales department of Digit Key. (*Id.* at 43.) Her productivity suffered due to difficulty typing, headaches, and neck and back pain. (*Id.* at 46.) After work restrictions were temporarily imposed in April 2007, Plaintiff never attempted to work again. (*Id.* at 47.) She applied for and received long-term disability benefits. (*Id.* at 44.)

### D.    Hearing Testimony from Vocational Expert Loren Haagenson

The ALJ asked vocational expert Loren Haagenson to consider a person between the ages of forty-seven and fifty; with a twelfth-grade education, an associate degree in accounting, and

past work experience in accounting; limited to sedentary work; able to lift ten pounds occasionally and less than ten pounds frequently; able to stand or walk with normal breaks for two hours in an eight-hour workday; able to sit with normal breaks for six hours in an eight-hour workday; limited to no overhead reaching with the right upper extremity; able to reach occasionally with the left upper extremity; frequently able to handle, finger, and feel with her hands; able to occasionally push or pull with her lower extremities; not able to climb ladders, ropes, or scaffolds; able to climb stairs and ramps occasionally; able to balance, stoop, kneel, crouch, and crawl occasionally; restricted from concentrated exposure to humidity, wetness, dust, odors, fumes, pulmonary irritants, extreme cold, or extreme heat; mentally able to understand, remember, and perform detailed job instructions; able to interact appropriately with supervisors, coworkers, and the public; and able to respond appropriately to changes in a typical work setting. (*Id.* at 79-80.) Haagenson responded that such a person would be able to work as a salesperson or secretary, both of which were classified as sedentary occupations. (*Id.* at 80.)

### E.    The ALJ's Decision

The ALJ issued an adverse decision on January 22, 2010, finding Plaintiff not disabled. (R. at 14-26.) Utilizing the five-step sequential evaluation described in 20 C.F.R. § 404.1520(a), he first determined that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of March 19, 2007. (*Id.* at 16.) Proceeding to the second step, he found that Plaintiff had severe impairments of obesity, COPD, asthma, fibromyalgia syndrome, sacroiliac joint dysfunction, chronic cervical and thoracic musculoligamentous sprain or strain, myofascial pain syndrome, depression, somatoform pain disorder, chronic cephalgia, and general malaise. (*Id.*)

At step three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or equaled any impairment listed in 20 C.F.R. pt. 404,

subpt. P, app. 1. (*Id.*) With respect to Plaintiff's physical impairments, he explicitly rejected Dr. Roper's Physical Capacities Evaluation because certain pages were unsigned and because Dr. Roper had seen Plaintiff only three times before completing the evaluation. (*Id.* at 17.) With respect to Plaintiff's mental impairments, the ALJ found her only mildly restricted in performing activities of daily living, mildly restricted in social functioning, and mildly to moderately limited in maintaining concentration, persistence, or pace. (*Id.* at 17-18.) Thus, Plaintiff did not satisfy any listing's criteria for disability.

Next, at step four, the ALJ found that Plaintiff had the residual functional capacity (RFC) to perform less than a full range of sedentary work. (*Id.* at 19.) In particular, he found Plaintiff limited to lifting or carrying up to ten pounds occasionally and less than ten pounds frequently, standing or walking no more than two hours in an eight-hour workday, and sitting no more than six hours in an eight-hour workday. (*Id.*) Plaintiff was further limited to varying degrees in reaching, using her upper extremities, pushing and pulling, climbing, stooping, kneeling, crouching, and crawling. (*Id.*) In addition, she could not tolerate concentrated exposure to extreme temperatures, humidity, wetness, dust, odors, fumes, or pulmonary irritants. (*Id.*) Mentally, Plaintiff could understand, remember, and follow detailed instructions; interact appropriately with others; and respond to changes in the workplace. (*Id.*)

As part of the RFC assessment, the ALJ discounted Plaintiff's subjective complaints of pain and other symptoms to the extent they did not comport with the parameters of the RFC. (*Id.* at 19-21.) Specifically, he found the claimed severity of her subjective complaints inconsistent with medical records, diagnostic testing and imaging, self-reports to physicians, frequency of treatment, medication regimen, and daily activities. (*Id.* at 21-24.) The ALJ rejected Dr. Roper's opinion that Plaintiff could not work fulltime, based on the brevity of the treatment relationship,

the lack of objective medical support, and inconsistencies with Plaintiff's testimony. (*Id.* at 24.) The ALJ rejected Dr. Vijayalakshmi's opinion that Plaintiff was not capable of gainful employment on the grounds that the opinion was not consistent with Dr. Vijayalakshmi's course of treatment and because he had treated Plaintiff only four times. (*Id.* at 25.) The ALJ rejected the report of Dr. Mickelson, Plaintiff's chiropractor, as conclusory.

Based on the RFC, the ALJ determined that Plaintiff was able to perform her past relevant work as a secretary or sales/orders person of electronic components. (*Id.*) Therefore, he found that she was not disabled. (*Id.* at 26.)

## II.     STANDARD OF REVIEW

An individual must be disabled to receive Social Security disability benefits. *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010). In this context, "disability" means "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). It is the claimant's burden to prove disability. *Teague v. Astrue*, 638 F.3d 611, 615 (8th Cir. 2011).

On review of a Commissioner's decision denying Social Security benefits, a court examines whether the findings of the ALJ were "supported by substantial evidence in the record as a whole." *See Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008) (citation omitted). "Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the ALJ's decision." *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006). Although the Court must consider "[e]vidence that both supports and detracts from the ALJ's decision," the ALJ's decision may not be reversed merely because some evidence supports another outcome. *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005). If it is possible to

reach conflicting positions from the record, but one of those positions is that of the ALJ, the decision must be affirmed. *Id.*

## III.   DISCUSSION

Plaintiff brings two challenges to the ALJ's decision. She first asserts that the ALJ failed to properly assess her credibility. Second, she argues that the ALJ failed to accord proper weight to her treating physicians' opinions and, instead, erroneously credited the opinions of non-examining consultants.

### A.   Plaintiff's Subjective Complaints

In assessing a claimant's credibility concerning subjective complaints, an ALJ must consider not only the objective medical evidence but also the claimant's prior work history, daily activities, extent and intensity of pain, side effects and effectiveness of medications, functional restrictions, precipitating and aggravating factors, and observations by third parties. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ may discount the claimant's credibility when her subjective complaints are inconsistent with the record. *Id.* As long as the ALJ acknowledges and considers the factors, he need not discuss each one explicitly. *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009) (citations omitted).

Here, the ALJ found Plaintiff's complaints of pain only partially credible due to inconsistencies with her medical records and hearing testimony, the lack of corroborating laboratory evidence and diagnostic findings, her infrequent treatment for COPD and asthma, the effectiveness of her medication and other therapies, and her daily activities. (R. at 20-23.) Plaintiff challenges several of these findings.

Beginning with Plaintiff's daily activities, Plaintiff contends that the ALJ misrepresented her abilities by highlighting her more strenuous activities while disregarding her daily routine.

Citing to evidence in the record, the ALJ observed that Plaintiff cared for her personal needs, shopped for groceries, cooked, occasionally gardened, washed dishes for five to ten minutes at a time, used a lightweight vacuum cleaner, helped her daughter care for her infant son, and occasionally babysat her other grandchildren overnight. The Eighth Circuit has repeatedly recognized that "acts such as cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking[] are inconsistent with subjective complaints of disabling pain." *E.g.*, *Medhaug v. Astrue*, 578 F.3d 805, 817 (8th Cir. 2009) (citing *Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005); *Riggins v. Apfel*, 177 F.3d 689, 693 (8th Cir. 1999)); *see also Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001) (remarking that an ALJ may consider daily activities such as "getting up, eating, reading, cleaning the house, making the bed and doing dishes with the help of [one's] husband, making meals, visiting with friends, and occasionally shopping and running errands" in assessing a claimant's credibility).

Notably, the ALJ did not entirely reject Plaintiff's subjective complaints. He accepted her testimony that washing dishes, cooking, and vacuuming aggravated her pain, and that numbness in her hands affected her ability to write. He also acknowledged that she was not able to fish as she had in the past, and that she had remained in the camper during a recent camping trip. On the whole, the Court finds that the ALJ's decision to partially reduce Plaintiff's credibility, based on her daily activities, is supported by substantial evidence.

Plaintiff next faults the ALJ for relying on the pain ratings described to her doctors, arguing that the pain scale has little relation to her ability to do activities on a daily basis. The ALJ noted in his decision that Plaintiff described her pain as a nine or ten only once to a medical provider, and that Plaintiff's providers never described her as appearing in acute distress due to pain. The ALJ found this at odds with her hearing testimony that she frequently experienced pain

rating a ten out of ten. An ALJ may properly consider such inconsistent statements in evaluating a claimant's credibility. *See Raney v. Barnhart*, 396 F.3d 1007, 1011 (8th Cir. 2005); *Talley v. Barnhart*, 113 F. App'x 185, 187 (8th Cir. 2004). Thus, the ALJ did not err in this respect.

Next, Plaintiff submits that her impairments of fibromyalgia, somatoform pain disorder, and myofascial pain disorder cannot be documented by objective imaging or findings, and that the ALJ should not have discounted the pain caused by these impairments simply because there was no objective substantiation. Addressing the lack of supporting evidence, the ALJ acknowledged that the impairments were documented in medical records, but remarked that the records did not correspond to the severity claimed by Plaintiff. He discounted the severity of pain caused by the above impairments, not because of a lack of objective medical imaging or testing, but due to the relatively low pain ratings reported by Plaintiff as well as her doctors' conservative treatment protocols. On the other hand, the ALJ did rely on the lack of objective imaging and testing in discounting pain attributable to Plaintiff's old shoulder injuries and surgeries, headaches, hand numbness, cervical and thoracic sprains or strains, and sacroiliac joint dysfunction. Sources of pain caused by these impairments—as compared to fibromyalgia, a somatoform pain disorder, or myofascial pain—are frequently documented in objective imaging and findings.

Finally, Plaintiff concedes that her symptoms were somewhat controlled with medication, but asserts that her pain was never totally relieved. The ALJ did not find that Plaintiff's pain was totally alleviated, however. He found that her medications were "relatively effective in controlling many of [her] symptoms," particularly COPD, asthma, and depression. (R. at 22.) This finding is well-supported by the record. With respect to Plaintiff's other impairments, the ALJ noted that she did not need narcotic medication to control her pain and that she obtained

partial relief from icepacks, ibuprofen, and muscle relaxants. As Plaintiff points out, she actually did take a narcotic medication, Tramadol, at some point, but the medicine was not prescribed as part of Plaintiff's standard regimen. Despite this slight mischaracterization of the record, the ALJ's determination that Plaintiff's pain was somewhat controlled by her medication is supported by substantial evidence in the record as a whole.

The ALJ's decision to partially reduce Plaintiff's credibility is supported by other substantial evidence as well. Plaintiff offered inconsistent testimony concerning pain in her shoulders and numbness in her hands. Although she claimed feeling debilitating pain, she admitted she could reach overhead with her left arm, fasten buttons, and operate zippers. In addition, she sought infrequent treatment for her COPD, asthma, and headaches. She did not follow her doctors' recommendations to resume physical therapy, to exercise at home, or to stop smoking. An ALJ may discredit the subjective complaints of a claimant who does not follow through with suggested treatment. *Gray v. Apfel*, 192 F.3d 799, 804 (8th Cir. 1999) (citation omitted).

In sum, the Court concludes that the ALJ properly assessed Plaintiff's credibility, and his reduction of her credibility is supported by substantial evidence of record.

### B.      The ALJ's Consideration of the Medical Evidence

Plaintiff argues that the ALJ failed to accord appropriate weight to the opinions of Dr. Roper, Dr. Vijayalakshmi, and Dr. Mickelson. "A treating physician's opinion is generally entitled to substantial weight, although it is not conclusive and must be supported by medically acceptable clinical or diagnostic data." *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998). When an ALJ decides not to give controlling weight to a treating source's opinion, the ALJ must give good reasons for that decision. 20 C.F.R. § 404.1527(d)(2). The amount of weight given to a

medical source's opinion depends on the length, nature, and extent of the treatment relationship; the frequency of examination; corroboration by medical signs and laboratory findings; consistency with the record as a whole; and the specialty of the source. *Id.* § 404.1527(d)(2)-(5).

### 1.    Dr. Roper

On the Physical Capacities Evaluation worksheet completed at Plaintiff's appointment on October 26, 2009, Dr. Roper concluded that Plaintiff could not work on a fulltime basis at even a sedentary level. The ALJ gave no weight to Dr. Roper's opinion at step three of the sequential analysis and little weight to the opinion in the RFC analysis at step four. He discounted the opinion because of her brief treatment relationship with Plaintiff and because the opinion was strikingly inconsistent with both Plaintiff's testimony and the record.

Dr. Roper began treating Plaintiff in July 14, 2009. She saw Plaintiff again on August 3, 2009, and a third time on October 29, 2009, at which time she completed the Physical Capacities Evaluation. Three appointments do not establish a lengthy or frequent treatment history. The length of a treatment relationship and the frequency of examination are permissible considerations in weighing a medical source's opinion, and the ALJ did not err in discounting Dr. Roper's opinion on these bases. Further, the ALJ adequately explained why he was discounting the opinion based on these factors.

The ALJ also reduced the amount of weight given to Dr. Roper's opinion for lack of corroborating medical signs and laboratory findings on the record as a whole. It is significant that all x-rays, MRIs, and other diagnostic testing of Plaintiff's soft tissue, bones, joints, vertebrae, cervical discs, cervical spaces, and spine alignment were normal. Several of Plaintiff's doctors, including Dr. Fennell, noted no evidence of cervical disc pathology, degenerative changes, or nerve entrapment. Physical examinations typically indicated only mild to moderate tautness,

discomfort, swelling, numbness, and tightness. Plaintiff's strength, range of motion, reflexes, and functional abilities were almost always good or unimpaired. There were no functional limitations imposed on sitting, walking, standing, lifting, carrying, or the use of Plaintiff's hands and feet. The ALJ correctly considered the absence of supporting medical signs and findings in decreasing the weight due to the Physical Capacities Evaluation.

The ALJ also accorded less weight to Dr. Roper's opinion because it was inconsistent with the record as a whole. An ALJ may properly reject the opinion of a medical source for this reason. *Bentley v. Shalala*, 52 F.3d 784, 787 (8th Cir. 1995). As the ALJ noted, nothing in the treatment records supports Dr. Roper's view that Plaintiff could not sit, walk, or stand for more than one hour in an eight-hour day, or that Plaintiff was basically precluded from using her hands and feet.

The medical records and objective findings of Dr. Roper are also inconsistent with the opinions expressed in the Physical Capacities Evaluation. On July 14, 2009, Dr. Roper documented a generally normal examination. The only notable exceptions were tenderness in Plaintiff's cervical and AC joints, a sacral torsion, and the presence of an unspecified number of fibromyalgia trigger points. Dr. Roper's physical impressions consisted of deconditioning and obesity, and there was no mention of any other physical impairment. She advised Plaintiff to work with a physical therapist and return in a month. This conservative treatment is not consistent with the findings contained in the Physical Capacities Evaluation or Dr. Roper's conclusion that Plaintiff's pain and fatigue would prevent her from working.

Dr. Roper's treatment note from August 3, 2009 is also inconsistent with her later findings. On that day, Plaintiff's extremities were stiff, but she had a normal range of motion. Plaintiff described her pain as a six out of ten, and Dr. Roper noted that Plaintiff was obtaining

adequate relief from her medications. Plaintiff's head, neck, and spine were normal in alignment, range of motion, and mobility. All neurological findings were normal. Dr. Roper wrote that Plaintiff had been previously diagnosed with fibromyalgia and myofascial pain syndrome, but she performed no independent testing or made any independent findings to confirm this. Dr. Roper recorded her own impressions as fibromyalgia, past shoulder injuries, and COPD. Her plan was for Plaintiff to begin a "vigorous reconditioning program." Once again, Dr. Roper's notations, impressions, and plan for treatment are not consistent with her assessment of Plaintiff's physical abilities.

At Plaintiff's third appointment, when Dr. Roper completed the Physical Capacities Evaluation form, Dr. Roper recorded a lengthy description of Plaintiff's present illnesses—as described by Plaintiff. Dr. Roper's physical examination revealed levels of discomfort, cervical tenderness, paravertebral spasms, and positive trigger points in four areas, but Dr. Roper noted nothing approaching the level of restrictions she marked on the evaluation form. Nor did Dr. Roper perform any functional ability testing at this appointment. It is clear from the treatment note that Dr. Roper based her findings almost exclusively on Plaintiff's subjective reports. An ALJ may give less weight to a treating source's opinion that is based primarily on the claimant's complaints of pain rather than on objective findings, *Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007), and an ALJ need not accept a doctor's conclusory opinion that is not supported by medical evidence, *Ward v. Heckler*, 786 F.2d 844, 846-47 (8th Cir. 1986). Both concerns are present here. Dr. Roper relied primarily on Plaintiff's subjective complaints in arriving at her opinion, and the objective medical evidence as recorded by Dr. Roper does not support her conclusions.

Dr. Roper's opinion also contrasted sharply with Plaintiff's own testimony concerning her daily activities. For example, Plaintiff testified that she could climb stairs, use her hands to fasten buttons and zip zippers, write, stand for ten minutes at a time, and sit for thirty minutes at a time. This testimony is directly at odds with Dr. Roper's findings concerning Plaintiff's ability to climb, use her hands, stand, and sit. Plaintiff also testified that she was sometimes able to drive, garden, babysit her grandchildren, and do household chores. These activities would not be possible for a person who could not use her hands to grasp or manipulate, could not use foot controls, or could not stoop or kneel, as Dr. Roper suggested.

As to Plaintiff's general criticism of the ALJ for not adopting Dr. Roper's conclusion that Plaintiff's pain and fatigue would prevent her from working fulltime, such a determination is reserved exclusively for the Commissioner to make. 20 C.F.R. § 404.1527(e)(1). "It is the ALJ's job to reach a decision as to the claimant's legal disability by evaluating the objective medical evidence before him." *Cox v. Barnhart*, 345 F.3d 606, 608 (8th Cir. 2003). Thus, the ALJ was under no obligation to adopt Dr. Roper's opinion regarding Plaintiff's ability to work fulltime, but was obligated to make this decision himself after reviewing all the medical evidence.

###### 2.     Dr. Vijayalakshmi

Dr. Vijayalakshmi twice opined that Plaintiff was not capable of gainful employment. The ALJ rejected Dr. Vijayalakshmi's opinion as inconsistent with his course of treatment and because his treatment of Plaintiff was infrequent. Substantial evidence supports the ALJ's findings.

According to the record, Plaintiff saw Dr. Vijayalakshmi four times between April 4, 2007 and February 19, 2008. The length of the treatment relationship was less than a year, and the four appointments were spaced at least two months apart. This does not establish a frequent,

comprehensive treatment relationship. Notably, at Plaintiff's third appointment, in August 2007, she asked Dr. Vijayalakshmi to complete her FMLA paperwork. His reluctance to do so, and advice to Plaintiff to ask her primary care physician in the future, is indicative of the sporadic, tentative nature of the treatment relationship.

As to the inconsistency of Dr. Vijayalakshmi's opinion with his course of treatment, Dr. Vijayalakshmi repeatedly recommended physical therapy, massage therapy, and home exercises to manage Plaintiff's pain. These conservative treatment methods are not consistent with his opinion that Plaintiff was so disabled by pain that she was unable to work. An ALJ may reject an opinion that is inconsistent with other substantial evidence of record. *Sultan v. Barnhart*, 368 F.3d 857, 863 (8th Cir. 2004).

Lastly, the ALJ was entitled to reject Dr. Vijayalakshmi's opinion regarding Plaintiff's ability to sustain gainful employment because this determination was reserved exclusively for the Commissioner. *See* 20 C.F.R. § 404.1527(e)(1)-(2). Thus, the ALJ was under no obligation to adopt Dr. Vijayalakshmi's opinion that Plaintiff could not work fulltime.

### 3.    Dr. Mickelson

After treating Plaintiff three times, her chiropractor, Dr. Mickelson, opined that her back and neck pain would preclude her from seeking any meaningful employment. The ALJ gave no weight to this opinion, because it was "quite conclusory" and provided "very little explanation of the evidence" on which Dr. Mickelson relied. (R. at 25.)

As Plaintiff concedes, a chiropractor is not an "acceptable medical source" as defined in 20 C.F.R. § 404.1513(a). Nevertheless, a chiropractor's opinion may still be useful to show the severity of an impairment and how it could affect a person's ability to work. *Id.* § 404.1513(d). An ALJ may discount a chiropractor's opinion for the same reasons as an acceptable medical

source. 20 C.F.R. § 404.1527(d). Here, the ALJ gave no weight to Dr. Mickelson's opinion because it was conclusory and not supported by medical evidence. These findings are supported by substantial record evidence. For example, in a letter dated April 2, 2009, Dr. Mickelson did not recount specific functional limitations or identify specific findings. He merely repeated Plaintiff's subjective complaints. Finally, as discussed above with respect to Plaintiff's other providers, whether she was precluded from gainful employment due to a disability was a question reserved for the Commissioner, and the ALJ rightfully rejected Dr. Mickelson's view on this question.

### 4.    Dr. Mark

Plaintiff's final argument is that the ALJ erred by crediting the opinion of Dr. Mark, a non-examining medical source. Granted, the opinion of a non-treating, non-examining physician, standing alone, cannot constitute substantial evidence. *Harvey v. Barnhart*, 368 F.3d 1013, 1016 (8th Cir. 2004). But when the opinion is one aspect of a record from which the ALJ draws his conclusions and which substantially supports his findings, no error occurs. *Id.* This was the case here. The record as a whole, as detailed above, gives ample support for the ALJ's findings and conclusions, and the ALJ considered Dr. Mark's opinion as but one part of the record as a whole.

Contrary to Plaintiff's assertion, Dr. Mark did summarize the records he reviewed. He referred to Plaintiff's shoulder surgeries, ongoing pain issues, COPD, asthma, headaches, attempts at physical therapy, nerve conduction studies, physical examination results, and diagnostic test results. He also quoted Dr. Fennell's comment that Plaintiff's attendance at her physical therapy appointments and compliance with her home exercise program were very poor. Thus, Dr. Mark's opinion was generally supported by and consistent with Plaintiff's medical records, entitling it to more weight under 20 C.F.R. § 404.1527(d) and (f).

## IV.    RECOMMENDATION

The Court concludes that the ALJ's findings in this case were supported by substantial evidence in the record as a whole. While there is some evidence that could support another outcome, the decision falls within the zone of choice that was available to the ALJ. *See Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011) (citing *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008)). Accordingly, based on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.    Plaintiff's Motion for Summary Judgment (Doc. No. 11) be **DENIED**;

2.    Defendant's Motion for Summary Judgment (Doc. No. 14) be **GRANTED**;

3.    This case be **DISMISSED WITH PREJUDICE**; and

4.    **JUDGMENT BE ENTERED ACCORDINGLY**.


Dated: December 15, 2011

  s/ *Jeanne J. Graham*
JEANNE J. GRAHAM
United States Magistrate Judge


### NOTICE

Pursuant to District of Minnesota Local Rule 72.2(b), any party may object to this Report and Recommendation by filing and serving specific, written objections by **December 30, 2011**. A party may respond to the objections within fourteen days after service thereof. Any objections or responses shall not exceed 3,500 words. The District Judge will make a de novo determination of those portions of the Report and Recommendation to which objections are made.